UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CHRISTOPHER GOODVINE,

                Plaintiff,

v.                                          Case No. 22-cv-204-pp

COMMANDER DUCKERT,
DEPUTY COMMANDER DOBSON,
CAPTAIN BRIGGS, CO ANDERSON,
CO PETERSON, CO ELLISON,
JANE DOE NURSE,
and JOHN DOE Jail Officials 1-3,

                Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 4) AND SCREENING COMPLAINT UNDER 28 U.S.C. §1915A**

---

Christopher Goodvine, who is confined at Columbia Correctional Institution and representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 4, and screens his complaint, dkt. no. 1.

**I.    Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 4)**

The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with his case without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1).

1

He then must pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On March 11, 2022, the court ordered the plaintiff to pay an initial partial filing fee of $1.36. Dkt. No. 6. The court received that fee on March 23, 2022. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

**II.    Screening the Complaint**

    A.    Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts,

accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B. The Plaintiff's Allegations

The plaintiff alleges that during the events described in the complaint, he was confined at the Milwaukee County Jail pending revocation and awaiting trial on criminal charges. Dkt. No. 1 at ¶3. He has sued Commander Duckert; Deputy Commander Dobson; Captain Briggs; Officers "K-9 Anderson," Peterson and Ellison; Jane Doe Nurse; and John Doe Jail Officials 1-3. Id. at ¶¶4-8.

The plaintiff alleges that in March 2020, he was confined in Unit 4b, a general population unit that houses both persons incarcerated in regular general population and persons incarcerated in protective custody general population. Id. at ¶11. He states that E. Girson, a seriously mentally ill person, also was housed in Unit 4b despite his history of assaulting other inmates. Id. at ¶¶9, 12. The plaintiff states that at the time, Girson either was designated for maximum custody administrative confinement or was on disciplinary status; the plaintiff asserts that persons who fell into either of those

3

classifications were "never housed in [general population] units." Id. at ¶12. The plaintiff says that when he arrived on the unit in early March, given Girson's assaultive nature, jail staff allowed Girson out of his cell for one hour a day, during which time he was not permitted to socialize or have physical contact with other incarcerated persons. Id. at ¶13. The plaintiff states this meant that staff required all Unit 4b inmates to be locked in their cells while Girson was out of his cell. Id. The plaintiff alleges, however, that that precaution wasn't effective because Girson had a propensity to "deploy milkshakes" against others. Id. at ¶14. Girson had allegedly gained notoriety for assaulting other incarcerated persons with a "milkshake," "a repulsive cocktail of urine, feces, saliva, and semen allowed to ferment for several days sometimes, then deployed to assault another by tossing it into their face and body." Id. at ¶9.

On March 13, 2020, Officer Anderson allegedly placed Girson in a restraint belt and escorted him from his cell to the dayroom, where Girson went directly to the garbage container, removed a carton and attempted to urinate in it. Id. at ¶17. The plaintiff states that Anderson stopped Girson from doing so, but then left the dayroom "without cancelling Girson's dayroom due to his behavior." Id. A short time later, Girson allegedly retrieved a "milkshake" from his cell and tossed it into the plaintiff's cell; the plaintiff alleges that the concoction got into his face, mouth, eyes, ears and nose. Id. at ¶18. Girson then began to urinate into the plaintiff's cell. Id. The plaintiff states that he and other incarcerated persons pushed their call buttons and told Officers Ellison

4

and Peterson that Girson had just assaulted the plaintiff. Id. at ¶19. Girson allegedly was "gi[ven] several directives to stop urin[at]ing into the plaintiff's cell and a team of support staff was called to respond to the incident." Id. The plaintiff states that when the support staff arrived, Girson bit them. Id. The plaintiff alleges that Girson was removed from the general population unit and was taken to a disciplinary unit. Id.

The plaintiff alleges that it was more than an hour before he was allowed to shower and that he never received medical care for "significant exposure."[1] Id. at ¶20. Peterson allegedly ridiculed the plaintiff for complaining about the assault and asking for medical care, and he failed to obtain medical care for the plaintiff. Id. The plaintiff states that he had to sit in his cell for more than an hour before janitors cleaned the fluid from his cell. Id. He plaintiff alleges that when defendant Jane Doe Nurse came to the unit to deliver medication, she made "disparaging and inappropriate comments about plaintiff seeking medical care for a little 'booboo' but refused to otherwise treat the plaintiff beyond giving him his regularly prescribed meds." Id. at ¶21.

The plaintiff asserts five claims. First, he claims that defendants Duckert, Dobson, Briggs and John Doe officials 1-3 knew of Girson's

---

[1] The plaintiff alleges that, in Wisconsin, the discharging or throwing of bodily fluids upon another is considered assault, punishable by jail time, and that incarcerated persons accused of the offense are subjected to the drawing of blood samples to ascertain if the person carries communicable diseases. Dkt. No. 1 at ¶15. The plaintiff also states that "[b]ecause bodily fluids such as feces and semen carry pathogens and communicable diseases, exposure to such fluids are considered a significant exposure and those subjected to such significant exposures are entitled to immediate medical treatment and remedial measures. Id. at ¶16.

propensity to assault other incarcerated persons with "milkshakes" but failed to take reasonable steps to abate the risk and instead turned a blind eye to it and even put him in a general population unit where he would have more opportunities to deploy "milkshakes." Id. at ¶22. The plaintiff claims that by placing Girson in a general population unit, these defendants failed to put into place measures to address the risk of serious harm to others, in violation of the Eighth and Fourteenth Amendments. Id.

Second, the plaintiff claims that Anderson, Ellison and Peterson, who were charged with monitoring Girson for assaultive behavior during his dayroom time, failed to do so. Id. at ¶25. He claims that they knew Girson had an assaultive history and a propensity to assault others with bodily fluids but despite knowing that Girson had just attempted to urinate into a milk container, allowed him to roam the unit and assault the plaintiff, in violation of the Eighth and Fourteenth Amendments. Id.

Third, the plaintiff claims that Jane Doe Nurse knew the plaintiff had suffered a "significant exposure to hazardous and potentially health-compromising bodily fluids," but rather than treat him she made jokes and inappropriate comments and refused to even triage him and take remedial measures to counter any potentially detrimental exposure to pathogens and other diseases. Id. at ¶27.

Fourth, the plaintiff claims that Duckert and Dobson knew that the jail did not have a procedure to implement when incarcerated persons were subjected to "significant exposure," even though state law requires that

incarcerated persons accused of tossing bodily fluids be tested for communicable diseases and that best practices dictate that incarcerated persons exposed be treated for significant exposures. Id. at ¶28. The plaintiff claims that persons incarcerated at the jail often were not provided with medical treatment after such assaults, in violation of the Eighth and Fourteenth Amendments. Id. at 6.

Fifth, the plaintiff claims that Duckert and Dobson knew that the jail had no procedure to treat incarcerated persons subjected to significant exposures and that "said practice, policy or custom of failing to treat such detainees constituted an abridgment of the plaintiff's rights under the 8th and 14th Amendments to the U.S. Constitution." Id. at ¶29.

The plaintiff seeks compensatory and punitive damages. Id. at 7.

C.   Analysis

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)).

The court assumes that the plaintiff was a pretrial detainee during the relevant time.[2] As a pretrial detainee, the plaintiff's conditions-of-confinement

---

[2] The plaintiff filed another case in this court in which he alleges he was a pretrial detainee at the Milwaukee County Jail in April 2020. Goodvine v. Adams, Case No. 22-cv-206-pp (E.D. Wis.).

claim arises under the Due Process Clause of the Fourteenth Amendment, which is governed by an objective standard. Kemp v. Fulton Cty., 27 F.4th 491, 495 (7th Cir. 2022) (citing Hardeman v. Curran, 933 F.3d 816 (7th Cir. 2019)). The plaintiff must show only that a defendant's conduct was "objectively unreasonable." Id. (citing Hardeman, 933 F.3d at 824). The defendants would be liable if they "acted purposefully, knowingly, or perhaps even recklessly," but not if they were no more than negligent. Id. (quoting Miranda v. Cty. of Lake, 900 F.3d 335, 353 (7th Cir. 2018)); see also Daniels v. Williams, 474 U.S. 327, 330-31 (1986) (a state official's "mere lack of due care" does not "'deprive' an individual of life, liberty, or property under the Fourteenth Amendment."). Objective reasonableness "turns on the facts and circumstances of each particular case." Id. (citing Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015)).

In Kingsley, the Supreme Court underscored the importance of the distinction between convicted persons and those who are detained pending adjudication of their cases; it held that a pretrial detainee bringing an excessive force claim under the Fourteenth Amendment was not required to satisfy the Eighth Amendment's subjective intent standard. Kemp, 27 F.4th at 495 (citing Kingsley, 576 U.S. at 389). Recently, the Seventh Circuit Court of Appeals applied the principles articulated in Kingsley to failure-to-protect claims. See Kemp, 27 F.th at 495-96. The elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer are:

> (1) [t]he defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) [t]hose conditions put the plaintiff at substantial risk of suffering serious harm; (3) [t]he defendant did not take reasonable available measures

8

> to abate that risk, *even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved*—making the consequences of the defendant's conduct obvious; and (4) [b]y not taking such measures, the defendant caused the plaintiff's injuries.

Id. at 496 (emphasis in original) (quoting Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1071 (9th Cir. 2016) (*en banc*)).

In his first cause of action, the plaintiff claims that Duckert, Dobson, Briggs and John Doe Jail Officials 1-3 knew of Girson's propensity to deploy "milkshakes" but turned a blind eye to the risk and even placed him in general population where he would have more opportunities to deploy "milkshakes" on inmates. Dkt. No. 1 at 5. A government official is "liable [only] for his or her own misconduct." Kemp, 27 F.4th at 497-98 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009)). To be liable, a supervisor must "know about the conduct and facilitate it, condone it, or turn a blind eye for fear of what they might see." Id. at 498 (quoting Matthews v. City of E. St. Louis, 675 F.3d 703, 708 (7th Cir. 2012)). Kingsley's objective-unreasonableness test applies to supervisory-liability claims. Id. ("[A]pplying *Kingsley's* objective-unreasonableness test, Kemp can defeat summary judgment only if the facts viewed in the light most favorable to him show that Standard and Ford acted purposefully, knowingly, or with reckless disregard for the consequences of hiring and retaining Burget despite his hearing disability").

The plaintiff has not stated a failure-to-protect claim against Duckert, Dobson, Briggs and John Does 1-3 based on allegations that they housed Girson in general population despite knowing about Girson's propensity to

deploy "milkshakes" on other incarcerated persons. While the plaintiff alleges that incarcerated persons with a history of assaulting other incarcerated persons, like Girson, "never" were housed in general population, the plaintiff does not explain how he knows this, or the source of his belief that this is so. Courts must accord prison and jail administrators wide-ranging deference in managing their institutions. See Thomas v. Ramos, 130 F3.d 754, 764 (7th Cir. 1997) (quoting Bell v. Wolfish, 441 U.S. 520, 547-48 (1979)). The plaintiff also alleges that, despite the fact that Girson had been placed in a general population unit, given his assaultive nature restrictions had been placed on Girson: he was allowed out of his cell for only one hour a day during which time he did not have contact with other incarcerated persons and all other incarcerated persons were required to be locked in their cells while Girson was out of his. The plaintiff alleges that, because Girson assaulted him, these restrictions were ineffective. But if staff had complied with the restrictions, Girson would not have been able to return to his cell to retrieve the "milkshake" and go to the plaintiff's cell to deploy it. The plaintiff has not stated a claim against Duckert, Dobson, Briggs and John Does 1-3 for placing Girson in general population.

The plaintiff may proceed on his second cause of action, a failure-to-protect claim, against Anderson, based on allegations that Anderson escorted Girson to the dayroom, stopped Girson when Girson started to urinate in a milk carton, but then left the dayroom. Anderson allegedly knew of Girson's assaultive history; leaving him in the dayroom put other incarcerated persons

10

at a substantial risk of harm. But the plaintiff has not alleged that Ellison and Peterson participated in allowing Girson to be out in the dayroom without supervision. Section 1983 limits liability to public employees who are personally responsible for a constitutional violation. Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009). For liability to attach, the individual defendant must have caused or participated in a constitutional violation. Hildebrandt v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003). Because the plaintiff has not alleged that Ellison and Peterson were personally involved in allowing Girson to be in the dayroom without supervision, he may not proceed against them on a conditions-of-confinement clam.

The plaintiff's remaining three "causes of action" relate to an alleged denial of medical care after the plaintiff was exposed to the "milkshake." A §1983 claim that a state pretrial detainee has received inadequate medical care arises under the Fourteenth Amendment's Due Process Clause. James v. Hale, 959 F.3d 307, 318 (7th Cir. 2020) (citing Miranda v. Cty. of Lake, 900 F.3d 335, 346-47 (7th Cir. 2018)). The plaintiff must allege that he suffered from an objectively serious medical condition. See Williams v. Ortiz, 827 F3.d 936, 942-43 (7th Cir. 2019) (citing McCann v. Ogle Cty., 909 F.3d 881, 886 (7th Cir. 2018)). Regarding the conduct of the defendants, claims of inadequate medical care while in pretrial detention are subject to an objective reasonableness standard. Id. (citing Miranda, 900 F.3d at 352). The plaintiff bears the burden to demonstrate objective unreasonableness, and he must make a two-part showing. Id. First, he must show that the defendants acted purposefully,

11

knowingly or recklessly when considering the consequences of their response to the medical condition at issue in the case. Id. (citing McCann v. Ogle Cty., Ill., 909 F.3d 881, 886 (7th Cir. 2018)). Second, the plaintiff must show that the challenged conduct was objectively unreasonable given the totality of the relevant facts and circumstances. Id.

The plaintiff's third, fourth and fifth causes of action focus on the defendants' failure to provide him with medical treatment after Girson tossed the "milkshake" into the plaintiff's cell. The plaintiff alleges that the contents of the "milkshake" went into his face, mouth, eyes, ears and nose. He states that he had to wait an hour to take a shower and for janitors to clean his cell. The plaintiff also states that he never received medical treatment for the significant exposure. He claims that when Jane Doe Nurse passed around medication, she made light of the exposure, referring to it as a "booboo" and refusing to treat him. The plaintiff also claims that the jail does not have a policy or procedure for treating incarcerated persons after significant exposures and that "best correction and medical practices dictate that inmates exposed to such exposures should be treated for significant exposures[.]" Dkt. No. at ¶28.[3]

The plaintiff has not stated an inadequate medical care claim because he has not alleged that the significant exposure resulted in his having a serious medical need. The court suspects the plaintiff assumes that the exposure itself

---

[3] The plaintiff also alleges that state law requires that prisoners accused of tossing bodily fluids be tested for communicable diseases. Dkt. No. 1 at ¶¶15, 28. The plaintiff has not alleged that Girson was not tested for communicable diseases.

12

qualifies as a serious medical need. But "[a] medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" Roe v. Elyea, 631 F.3d 843 857 (7th Cir. 2011) (quoting Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)). The condition does not need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010). The plaintiff implies that about an hour after the exposure, he took a shower and his cell was cleaned; he does not allege that he suffered any adverse effects from the exposure (such as infection or illness). This means the plaintiff has not stated a plausible claim for relief based on inadequate medical care. The plaintiff may not proceed on his third, fourth and fifth causes of action.

The court does not mean to imply that the occurrence the plaintiff describes was not terrible and that it created risk to the plaintiff. The court concludes only that the plaintiff has not stated sufficient facts to state an inadequate medical care claim. The plaintiff may proceed on a failure-to-protect claim against Officer Anderson. The court will dismiss the remaining defendants.

### III. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 4.

13

The court **DISMISSES** defendants Commander Duckert, Deputy Commander Dobson, Captain Briggs, CO Peterson, CO Ellison, Jane Doe Nurse and John Doe Jail Officials.

Under an informal service agreement between Milwaukee County and this court, the court will electronically transmit a copy of the complaint and this order to Milwaukee County for service on defendant CO Anderson. Under the informal service agreement, the court **ORDERS** that defendant to file a responsive pleading to the complaint within 60 days.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the $348.64 balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to Warden at Columbia Correctional Institution.

The court **ORDERS** that the parties must not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and filing dispositive motions.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[4] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

>Office of the Clerk
>United States District Court
>Eastern District of Wisconsin
>362 United States Courthouse
>517 E. Wisconsin Avenue
>Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The court also advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing this case without further notice.

The court will include a guide prepared by court staff to address common questions that arise in cases filed by incarcerated persons. Entitled "Answers

---

[4] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

to Prisoner Litigants' Common Questions," this guide contains information that the plaintiff may find useful in prosecuting his case.

Dated in Milwaukee, Wisconsin, this 26th day of October, 2022.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**